E-FILED
Friday, 04 November, 2005 02:03:12 PM
Clerk, U.S. District Court, ILCD

IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT

SANGAMON COUNTY, ILLINOIS

PEOPLE OF THE                )
STATE OF ILLINOIS,           )
                             )
          Plaintiff,         )
                             )     CRIMINAL DIVISION
     vs.                     )
                             )     NOS. 2004-CF-648 and
                             )     2005-CF-1143
SCOTT GLISSON,               )
                             )
          Defendant.         )

<u>MOTIONS</u>

REPORT OF EXCERPTS OF PROCEEDINGS of the

hearing held before the Honorable ROBERT J. EGGERS, on

the 22nd day of September, 2005.

     APPEARANCES:

          HONORABLE JOHN SCHMIDT,
               State's Attorney of Sangamon County by,
          MR. DWAYNE GAB,
               Assistant State's Attorney
               for the People of the State of Illinois.

          MS. PATRICIA HAYES,
               Attorney at Law
               on behalf of the Defendant.

Andrea S. Pryor, CSR
Official Court Reporter
Room 732 - Sangamon County Complex
Springfield, IL  62701
(217) 753-6390
Lic. No. 084-002387

1

I N D E X

| WITNESSES | PAGE |
|---|---|
| SCOTT GLISSON | |
| Direct Examination by Ms. Hayes | 16 |
| Cross Examination by Mr. Gab | 30 |
| Redirect Examination by Ms. Hayes | 39 |
| Recross Examination by Mr. Gab | 40 |
| | |
| KENNY MARSHALL | |
| Direct Examination by Ms. Hayes | 41 |
| Cross Examination by Mr. Gab | 50 |
| | |
| NANCY SUE DAVIS | |
| Direct Examination by Ms. Hayes | 51 |
| | |
| SCOTT GLISSON | |
| Recalled by Ms. Hayes | 78 |

EXHIBITS                    ADMITTED

None

1              THE COURT:  All right, this is 04-CF-648, and

2        05-CF-1143, both of those cases, People v. Scott

3        Glisson, who is here with Patricia Hayes.  Duane Gab

4        appears for the Sheriff's Office apparently.  We are

5        here on a --

6              MR. GAB:  Well, Judge, I think since these are

7        all --

8              THE COURT:  Let me say what I think we are here on.

9        I think we are here on a Petition Seeking an Injunction

10       to Allow Unrestricted Visits with Defendant's attorneys.

11       So that's what I think we are here on today.

12              It was my understanding from our previous

13       hearing last week that Mr. Costello was going to be

14       entering his appearance and also representing the

15       Defendant at these hearings.  Is Mr. Costello not

16       getting in these matters, Miss Hayes?

17              MS. HAYES:  He has not been retained yet as of

18       today.  We are still talking to him about it, but as of

19       today he's not representing Mr. Glisson.

20              THE COURT:  The first concern that I have then is

21       in 04-CF-648, is this -- is the petition that you filed

22       with respect to these unrestricted visits.  Does that

23       have anything to do with that case?

24              MS. HAYES:  In 648?

3

1          THE COURT:  The old case that he is serving the

2     180-day sentence at the present time.

3          MS. HAYES:  Just in aspects of their supplemental

4     Petitions to Revoke that were filed, and we filed a

5     Motion to Strike those and dismiss those petitions.

6          THE COURT:  So we are here then on that case as

7     well.  Well, then we need to -- we need to, first off, I

8     guess, address this issue of your ability to proceed to

9     represent -- are you married to Mr. Glisson at the

10    present time?

11         MS. HAYES:  Yes.

12         THE COURT:  I don't know that either of you have

13    presented me with any authority on that issue.

14         MS. HAYES:  I did today, Your Honor.  That's on the

15    Motion to Allow Defendant to Retain Counsel.

16         THE COURT:  But does it -- do the cases -- I've

17    looked at the cases.  They don't seem to go to the issue

18    that you're facing in this case.

19         MS. HAYES:  I believe it goes directly to that

20    issue, Your Honor.  The cases hold that the Defendant is

21    entitled to retain counsel of choice regardless of any

22    actual conflicts or even perceived conflicts.  That's

23    People v. Johnson and People v. Freidrich.  Those are

24    1960 and 1979 Supreme Court cases that specifically

4

1    address and hold that the Defendant is entitled to his

2    retained counsel of choice, and to deny him retained

3    counsel of choice is reversible error.

4        THE COURT:  Mr. Gab, anything you want to say on

5    that issue?

6        MR. GAB:  Well, yes.  I do have a few things I'd

7    like to say.  Judge, first off, what we are here on

8    today is a Petition to Revoke for Rule to Show Cause

9    that Miss Hayes filed last week, and that was in

10   relation to an order that this Court entered on

11   September 9th.

12        In regards to her Memorandum of Law for

13   Injunctive Relief and her Motion to Retain Counsel, this

14   has never been set for hearing.  And in fact, it was

15   filed yesterday and was served on my office today, and I

16   personally just saw it when I walked in the courtroom.

17   My understanding of the court proceedings was a Rule to

18   Show Cause regarding that order.  I filed a Motion to

19   Strike today in relation to that Rule to Show Cause.

20        In regards to injunctive relief, Judge, I've

21   never heard of injunctive relief being offered in a

22   criminal proceeding.  I'm unaware of any criminal

23   procedural code although that allows for this kind of

24   injunctive relief.  These -- all these things have been

5

1    filed in criminal cases, and this just isn't the right

2    case to be trying these in. I'm here before the Court

3    on criminal cases. Therefore, I appear before the Court

4    as the People of the State of Illinois. You know, I

5    mean, do I have these matters briefed? Obviously not,

6    because these weren't the matters that were before the

7    Court today. And to say that at best six hours' notice

8    to the State of Illinois is sufficient notice to look at

9    all of these issues I think is patently absurd. I have

10   never heard of in my whole legal career a Judge issuing

11   an injunctive order in a criminal felony case.

12         I would also offer to the Court a complaint

13   that Miss Hayes gave me today, and it's about a

14   complaint filed in the Federal District Court. And in

15   fact, if she wants injunctive relief or denial of

16   deprivation of constitutional rights by the jail or the

17   State's Attorney's Office, that is in fact the type of

18   complaint she should file. She could file it in the

19   Circuit Court. She could file it in the Federal

20   District Court. She has filed it in the Federal

21   District Court. But to say that because there's some

22   case file out there, I can file anything I want to and

23   the Federal District case law says I have a right to do

24   that in this case, she doesn't have any authority saying

6

1    she can do any of these things here.

2        MS. HAYES:  Your Honor, I believe the Court retains

3    jurisdiction to rule on matters concerning the

4    confinement of an inmate under the control of the Court

5    in that criminal matter.  I believe that goes to the

6    Court's inherent authority to uphold the Constitution of

7    both the State of Illinois and the Constitution of the

8    United States.  Those are elementary matters, and the

9    issue of my representation has been before this Court

10   since the onset, and if Mr. Gab has failed to do any

11   research on that issue, that is not our fault.  We have

12   researched the issue, and we have found that the case

13   law is quite clear.  It's a Supreme Court holding that

14   says that Mr. Glisson has a right to retain counsel of

15   his choice, and only he can make the decision whether to

16   waive that conflict, not the State.  This is not the

17   State's right to have an attorney for Mr. Glisson.  This

18   is Mr. Glisson's right.

19        As to the federal complaint that has been

20   filed, yes, it has been filed because Mr. Glisson and

21   others continue to be denied their constitutional right

22   to counsel by the Sangamon County Jail.  Does that take

23   away the authority of this Court to also have

24   jurisdiction regarding conditions of Mr. Glisson and

1    imprisonment or confinement?  I don't believe it does.

2    We have raised these issues from the onset, and to date

3    my client has been denied meaningful access to the

4    courts, has not been able to prepare for any of the

5    charges against him or even prepare for this hearing

6    today because of the restrictions placed upon him and by

7    the Sangamon County Jail.  We would ask the Court to

8    hear this matter today.  Thank you.

9        MR. GAB:  Judge --

10        THE COURT:  Well, wait, wait.  We have a Rule to

11   Show Cause that was filed and was set today.

12        MR. GAB:  That's correct, Judge.

13        THE COURT:  And we have the Complaint for an

14   Injunction.  You're not telling the Court that you're

15   entering your appearance on behalf of anybody on that,

16   that will end that problem?

17        MR. GAB:  No, Judge.  What I'm saying is that she

18   has -- there are adequate remedies for constitutional

19   deprivations outside of a criminal felony filing, and if

20   you review the Criminal Procedural Act, there's nothing

21   there that talks about this type of relief.

22        I would also note for the Court that in

23   regards to representation, I remember on several

24   occasions, on the record, where Miss Hayes represented

8

1    that Mr. Costello was going to be representing him in

2    regards to the crime where she was the victim, and she

3    was going to be representing him as to the new crime,

4    and as far as I knew, the Court went along with that and

5    ruled that's the way it should be.  So to say that I

6    shouldn't be caught by surprise or bring it up again, I

7    think is a little out of bounds in regards to previous

8    representations made to this Court.

9         I have some issues in regards to 04-CF-648

10   that I would like to bring up to the Court.  I don't

11   know who represents him.  I believe the Court has

12   previously ruled that Mr. Costello -- that Miss Hayes

13   has said she is not going to represent him, that Mr.

14   Costello is going to represent him.  He's currently on

15   his mittimus, and his mittimus was stayed until, I

16   think, the 27th.

17        MS. HAYES:  The 20th.

18        MR. GAB:  Okay, he has been in custody since last

19   week.

20        THE DEFENDANT:  September 3rd.

21        MS. HAYES:  September 3rd.

22        MR. GAB:  I think that the issue of his, you know,

23   mittimus and the bond and all of those other things that

24   was outstanding at this point is moot because the

9

1    mittimus hasn't been stayed past that date.  So it's the

2    State's position that now he's in on his mittimus.  You

3    know, I mean, in regards to that, I think all of the

4    matters in regards to 04-CF-648 on my Petition to Revoke

5    his Mittimus are now moot.  However, in regard to the

6    Petition to Revoke probation, that still is outstanding.

7    But my understanding of our last -- the last time we

8    were before this Court was Miss Hayes had filed a

9    Petition to Revoke for Rule to Show Cause that was set

10   for hearing today.  If the Court wants to consider these

11   other injunctive relief actions, I think that the

12   State's position is this isn't the right court for it.

13   This isn't the right filing for it.  Show me something

14   in the Criminal Procedural Act that says that you can

15   ask the Court for injunctive relief.

16          THE COURT:  You're asking me to show you?

17          MR. GAB:  No, I'm saying Miss Hayes needs to show

18   that.

19          THE COURT:  Well, I'm not sure that I agree with

20   the People's position, but what we are here on today is

21   the Petition for Rule to Show Cause, and at first blush,

22   it was my opinion and impression that Miss Hayes did not

23   have the authority to represent Mr. Glisson in the

24   probation case, the one that he's presently serving 180

1    days on.  There is a Petition to Revoke his Probation,

2    the new Petition to Revoke that's pending.  And due to

3    her status as the victim in that case, I didn't think

4    that she would have authority, that there would be a

5    conflict there.  I have looked at the ethical things for

6    lawyers, whether they ought to be getting into cases

7    where they have conflicts, and those rules seem to

8    indicate that if the Defendant or the client is advised

9    of those and knowingly waives them, that takes care of

10   that.  And Mr. Glisson, I believe, has indicated on the

11   record previously that he is aware of the conflicts.

12   And you are aware of them, are you not, Mr. Glisson?

13        THE DEFENDANT:  Yes, Your Honor, I am.

14        THE COURT:  And you're willing to waive them?

15        THE DEFENDANT:  Yes, Your Honor.

16        THE COURT:  So I don't know what more can be done.

17   The factual basis of this Freidrich case and the Johnson

18   case are different than what we are confronting here,

19   but there are broad statements of the Court that the

20   Defendant has a choice as to his representation

21   regardless of actual or perceived conflicts.  I believe

22   that we have an actual conflict here, and he's

23   apparently willing to waive it.  Now, the concern that I

24   have with respect to all of this is that filed last week

1    was the Petition to have this Defendant advised on

2    fitness.  So we are now back to whether or not this

3    Court ought to take a waiver of an actual conflict in

4    the Court's view when we have a pleading on file

5    alleging unfitness.

6         MR. GAB:  It does have to be a knowing waiver,

7    Judge.

8         THE COURT:  So therein lies the problem with where

9    we are at here.  Obviously, we won't be having these

10   problems.  I don't think there is any problem with the

11   05-CF-1143 proceeding with that because you are not the

12   victim in that case, but the 04-CF-648 presents a

13   problem to the Court, and that was going to be overcome

14   if Mr. Costello had appeared.  So I don't know how -- I

15   don't know how I'm going to be able to proceed with what

16   I view to be an actual conflict when I've got to have a

17   knowing waiver of somebody that you allege is not fit,

18   Miss Hayes.

19        MS. HAYES:  Yes, Your Honor.

20        THE COURT:  Therein is the dilemma that I face on

21   04-CF-648.  I don't have that same problem in the other

22   case, and I would be inclined to proceed to hearing on

23   that case but not on 04-CF-648.

24        MS. HAYES:  I believe that would cover it, if we

1    just proceed on the first case, 1143.  I mean, the issue

2    is going to be resolved one way or the other, on the

3    attorney representation issue.

4         THE COURT:  All right, I will -- Mr. Glisson, do

5    you understand --

6         THE DEFENDANT:  Yes, Your Honor.

7         THE COURT:  -- what it is your lawyer is willing to

8    do?

9         THE DEFENDANT:  Yes, Your Honor.

10        THE COURT:  You have two cases here.  You have the

11   new case that has been filed and you have the old case,

12   and I'm not willing to take a waiver from you on the old

13   case of the conflict that Miss Hayes has in representing

14   you.  I don't know whether you can do that knowingly,

15   given the fact that you've asked for a fitness hearing.

16   So let's see what the -- what comes down, and we will

17   proceed on the other one.  On the other case, however,

18   the only thing this Court is proceeding on is the

19   Petition for a Rule, and I am not proceeding on the --

20   this injunction issue.  I tend to agree with Mr. Gab,

21   that that needs to be filed in a separate action in

22   court.  You've apparently filed one in Federal Court.  I

23   don't know whether that's going to remove jurisdiction

24   from us to do that.  I don't know about that, but if

13

1    you're going to be doing all of that, you need to serve

2    those people.  The issue that I'm dealing with in

3    05-CF-1143 is in my view, a different issue, and I will

4    proceed with that.  So you may call your first witness.

5        MS. HAYES:  Your Honor, I would make a Motion to

6    Exclude Witnesses.

7        THE COURT:  Your motion will be allowed.

8        MR. GAB:  Judge, if I may, I did file a Motion to

9    Strike.

10       THE COURT:  Oh, I'll hear you on that.

11       MR. GAB:  Can we please hear that?

12       THE COURT:  Yes.

13       MR. GAB:  Judge, in my Motion to Strike, I think

14   it's fairly simple.  It basically redacts, and I

15   apologize for the lateness, but I did not get the

16   transcript of the proceedings until this morning,

17   redacts the statement of the Court made at the time that

18   this hearing was had in regards to visitation at the

19   jail.  And if you look at the four different statements

20   redacted in my Motion to Strike, in relation to your

21   direction to the jail as to what they should do, it

22   appears to me that your direction is that they should

23   treat Miss Hayes as attorney of record, and that is

24   really what your ruling is limited to, if we boil it all

14

1    down.

2            In regards to the affidavit that I filed with

3    this Motion to Strike, I think it is clear from that

4    affidavit that in fact the jail did treat her as they

5    would treat other attorneys in a like situation.  Our

6    hearing today isn't about the appropriateness of whether

7    the jail can restrict that visitation.  Our hearing

8    today is about the fact of whether or not the jail

9    willfully and intentionally violated this Court's order.

10   And based upon what the Court's order was at that point

11   in time and what the jail does, and as indicated in that

12   affidavit, I believe there is not enough to go forward

13   with on any Petition for Rule to Show Cause.

14        THE COURT:  All right.  I'm going to deny the

15   Motion to Strike.  You may call your first witness.

16        MS. HAYES:  I would again ask that the witnesses be

17   excluded.

18        THE COURT:  All witnesses, other than the first

19   witness, need to step out.

20        MS. HAYES:  We will call Scott Glisson.

21                    (Witness sworn.)

22

23

24

15

1                              SCOTT GLISSON

2         was called as a witness on his own behalf, having first

3         been duly sworn, was examined and testified as follows:

4                            DIRECT EXAMINATION

5                             BY MS. HAYES:

6              Q    Scott, could you please state your full name?

7              A    Scott Nelson Glisson, G-L-I-S-S-O-N.

8              Q    And you're the Defendant in cause 05-CF-1143?

9              A    That's correct.

10             Q    Were you arrested on or about August 16th,

11        2005?

12             A    Yes, I was.

13             Q    And at that time you were taken to the

14        Sangamon County Jail?

15             A    That's correct.

16             Q    And were you in jail from August 16th through

17        August 19th?

18             A    Yes.

19             Q    During that time, did I visit you as an

20        attorney?

21             A    Yes, you did.

22             Q    Did I visit you on August 17th, 2005?

23             A    Yes, you did.

24             Q    Do you recall having an attorney-client visit

                                    16

1    with me and on the first floor?

2        A    Yes, I do.

3        Q    In a room that was not divided by glass?

4        A    Yes.

5        Q    It was a general interview room?

6        A    Yes.

7        Q    Was your visit with me restricted in any way?

8        A    No.

9        Q    Were you in an agitated state?

10       A    Yes, I was.

11       Q    And were you loud?

12       A    Yes.

13       Q    And did anyone stop our attorney-client

14   meeting on that date?

15       A    No, they did not.

16       Q    And then again on the 18th in the morning, did

17   I visit you again?

18       A    Yes, you did.

19       Q    And at that time were you upstairs?

20       A    Yes, I was on the third floor.

21       Q    And was I allowed to meet with you in an

22   attorney-client interview room?

23       A    Yes.

24       Q    And in that room, was it divided by glass?

17

1          A    No, it was not.

2          Q    Did you have to talk to me via phone?

3          A    No.

4          Q    Were you allowed to look at documents I

5     brought in?

6          A    Yes, I was.

7          Q    And in that room, were there any windows?

8          A    No.

9          Q    And there's a door, a secure door on --

10         A    A secure door, and actually there are a few

11    windows on the side of the door, I guess.

12         Q    Okay, but not into the room, is that correct?

13         A    No.

14         Q    And during that visit, we were allowed -- were

15    you a little bit agitated at that visit?

16         A    Yes, I was.

17         Q    Were you a little loud?

18         A    Yes.

19         Q    And were we allowed to meet the entire time

20    for about 15, 20 minutes?

21         A    Yes, approximately.

22         Q    And did I return that afternoon again to

23    discuss the proceedings against you?

24         A    Yes, you did.

1          Q     And at that time were you allowed to meet in

2     an attorney-client room?

3          A     Yes.

4          Q     And was it between glass?

5          A     No.

6          Q     Free access of communication?

7          MR. GAB:  Objection, Judge, leading the witness.

8          THE COURT:  Overruled.

9          THE WITNESS:  Yep.

10         MS. HAYES:

11         Q     Okay, and did it have windows leading into the

12    room?

13         A     No.

14         Q     Did I return a third time that evening to

15    discuss your bail?

16         MR. GAB:  Judge, if you would show a continuing

17    objection to the leading nature of the questions.

18         THE COURT:  I don't want to give you that.  Some of

19    this -- we want to get the testimony in.  Others might

20    be appropriate.

21         MR. GAB:  Then I would object once again as to

22    leading.

23         THE COURT:  Overruled.

24

19

1          MS. HAYES:

2          Q    Did you see me a third time on -- I mean, on

3    August 18th?

4          A    Yes, at approximately 8:00 p.m.

5          Q    And did anything happen that was out of the

6    ordinary during that visit?

7          A    Not compared to my other visit, no.

8          Q    You were a little agitated and upset?

9          A    Yes.

10         Q    At some point did an officer by the name of

11   Melissa Childress yell something into the room

12   concerning your marital status?

13         A    Yes.  She said, "They are married."

14         Q    To who?

15         A    To us.

16         Q    And she said that outside the room?

17         A    Yes.  Actually, she said that on the way to

18   the visit.

19         MR. GAB:  Judge, I object to relevance.  My

20   question would be, is this a hearing about whether or

21   not the Court -- the jail's action is appropriate or is

22   this a hearing about whether or not they violated this

23   Court's order?  If it's about whether or not they

24   violated this Court's order, it's beyond me how this is

1    relevant.

2          THE COURT:   Overruled.

3          MS. HAYES:

4          Q    What happened after Melissa Childress yelled

5    "They are married "?

6          A    Lieutenant Candace Cain came into the room and

7    stopped the visit and said, "This visit is over.  That's

8    your wife, and this visit is over."  And then I was

9    removed from the room, and you were taken out.

10         Q    Did she say any other reason for stopping the

11   attorney-client meeting?

12         A    She said there's a conflict of representing me

13   because you're my wife, and she accused you of doing

14   unethical things because of this.

15         Q    And that's -- that was the phase in which she

16   stopped the meeting?

17         A    Yes, because we were married.

18         Q    After that, you were arrested on August 26th,

19   is that correct?

20         A    That's correct.

21         Q    And at that time that was on charges of

22   05-CF-1143?

23         A    Yes.

24         Q    And during the next day after you were

21

1    arrested did I -- did you call me to have me come up to

2    represent you?

3         A    Yes, I did.

4         Q    And did I appear on August 8th, August 28th --

5    or 27th?

6         A    Yes, you did.

7         Q    And --

8         THE COURT:  Which date?

9         MS. HAYES:  What?

10        THE COURT:  Which date?

11        MS. HAYES:  I'm sorry, August 27th, Saturday.

12        A    Yes.

13        Q    And at that time were we allowed to meet in

14   the attorney-client interview room?

15        A    Yes, we were.

16        Q    Okay.

17        A    August 27th or August 28th.

18        Q    That's after the second time that you were

19   arrested, were we put into a room with glass --

20        MR. GAB:  Judge, leading.  He doesn't even know

21   what date he's talking about.

22        THE COURT:  Sustained.

23        MS. HAYES:

24        Q    On August 27th, did you have -- did we have

22

```
1        our attorney-client conversation stopped?

2            A    Yes.

3            Q    Where were we forced to have our

4    attorney-client consultation?

5            A    We were forced to have our meetings between

6    the glass, via telephone, across from the warden's

7    office.

8            Q    And that was?

9            A    On the first floor.

10           Q    And there was glass looking into the room?

11           A    Yes.

12           Q    And during that time did inmates and other

13   correctional officers walk by?

14           A    Numerous times.

15           Q    And since that time, have you been allowed to

16   have confidential conversations with your attorney,

17   myself?

18           A    No, I have not.

19           Q    And how have they been restricted?

20           A    Each one since August 27th have been on the

21   first floor across from the warden's office with glass

22   separating us, and a phone, kind of like the visit that

23   I had with my mom or my father.  It's sort of similar to

24   that.  We have the glass and we talk through a
```

23

1      telephone, and everything is tape-recorded.  It's not

2      confidential in any way.

3          Q    And in addition to that, have your papers been

4      -- the paperwork that I brought in to you and you've

5      given me, have they been reviewed by the staff at the

6      Sangamon County Jail?

7          A    Yes, they have.

8          Q    I'm going to show you some documents that I

9      would like to have treated as confidential

10     communications.  If the Court would note that these are

11     the type of paperwork that he has had to pass back and

12     forth by jail guards.

13         THE COURT:  Is the Court going to be able to look

14     at them?

15         MS. HAYES:  The Court can in camera.  I don't want

16     the other side to look at them.

17         MR. GAB:  I'm confused.  The purpose of this,

18     Judge?

19         MS. HAYES:  It goes to the fact that he has been

20     denied meaningful attorney-client meetings with his

21     attorney.

22         MR. GAB:  Is she trying to give to the Court the

23     papers that she is trying to pass and she is saying

24     these are confidential, they shouldn't have to do it

1    this way, or is she trying to show the way they are

2    being passed or both?

3        MS. HAYES:  I think that's the same thing.

4        THE COURT:  Well, I understand that you've

5    indicated that the papers have been reviewed by the

6    staff at the jail.

7        MS. HAYES:  Okay, but I want -- these are the

8    papers that were reviewed.

9        THE COURT:  Yeah, I don't know what that adds to

10   whatever it is you're doing.

11       MS. HAYES:  All right.

12       Q    And this in addition to paperwork, the legal

13   materials that I brought into you, have they been

14   confiscated by the jail?

15       A    Yes, they have.

16       MR. GAB:  Objection, leading, and I would say

17   ambiguous.  I don't know what the term "legal materials"

18   means.

19       THE COURT:  Sustained.  I'll strike the last

20   answer.

21       MS. HAYES:

22       Q    Scott, I'm going to hand you what I'm going to

23   mark as Exhibit 1.  Have you reviewed those documents?

24       A    Yes.

1        Q    On September 17th of this year, did I bring in

2    sealed legal documents for you?

3        A    Yes, you did.

4        Q    And was the document opened up in your

5    presence?

6        A    Yes, it was.

7        Q    And were those documents confiscated by the

8    jail?

9        A    Yes, by Sergeant Guy, I believe was his name.

10       Q    And what are those documents?

11       A    Envelopes, some express mail, manila envelope

12    which they have already given me one of these prior to

13    that visit, but they just had to take the metal off, but

14    this time --

15    MS. HAYES:  Objection the response is

16    non-responsive.

17    THE COURT:  I don't know that that's an objection

18    that you can make --

19    MS. HAYES:  Relevance then, Judge.

20    THE COURT:  I'm sorry?

21    MS. HAYES:  It would be relevance.

22    THE COURT:  I'll sustain.  I don't think your

23    answer is -- goes to the question.

24    THE WITNESS:  Yes, Your Honor.

26

1                    Post-it labels, some stamps, a file to hold

2        some manila files that I have and another one of these

3        manila envelopes.  That's all.

4        MS. HAYES:

5        Q    That's all that was in there?

6        A    Yeah.

7        THE COURT:  I don't understand your testimony.  You

8        say they confiscated them.  How is it you have them in

9        your hands now?

10       MS. HAYES:

11       Q    Did they give them back to your attorney?

12       THE COURT:  Well, just a minute, I'm asking this

13       witness.

14       THE WITNESS:  They -- Sergeant Guy put them in the

15       main room and told Miss Hayes to pick them up on her way

16       out.

17       THE COURT:  All right.

18       MS. HAYES:

19       Q    You were present in court on September 9th of

20       this year where we filed a motion for the Court to order

21       the jail to allow us to have -- for you to have access

22       to your attorney the same as any other attorney?

23       A    Yes, Judge Eggers did.

24       Q    And it was your understanding of the order

27

1    after September 9th -- what was your understanding of

2    that order.

3        A    That after September 9th, after the ruling was

4    made that day, that we would be --

5        MR. GAB:  Objection, relevance, Judge.  I don't

6    know what his understanding of the order has to do with

7    any of this.

8        THE COURT:  I'll sustain.

9        MS. HAYES:

10       Q    On September 10th, were you present when I

11   came for an attorney visit?

12       A    Yes.

13       Q    Do you recall what happened on that date?

14       A    On September 10th?

15       Q    Yes, the next day after the Court order?

16       A    Yeah, it was about 7:00 p.m.  We went

17   downstairs to the first floor where we had been meeting

18   since August 27th.  The meeting between -- we were

19   forced to meet again through glass, through telephone,

20   and I do believe it was Sergeant Tammy Powell that

21   instructed us to view the Court order.  We were not

22   allowed to visit in an unrestricted confidential room.

23       Q    That's what you were told?

24       A    Yes.

28

1        Q    Did you ask to see the Court order?

2        A    Yes, I did.

3        Q    Were you given a copy of the Court order?

4        A    No.

5        Q    And have -- since that time, have all of your

6    visits with your attorney been restricted?

7        A    Yes, they have.

8        Q    Including last night?

9        A    Yes.

10        Q    And the reason that you've been given is what?

11        A    Because of the Court order and that we were

12    married.  But there's a conflict of interest that we

13    were married, and that if there's a Court order, and

14    I've never been shown this Court order, it was my

15    understanding that on September 9th Judge Eggers made a

16    ruling.

17        MR. GAB:  Objection, Judge.

18        THE COURT:  Sustained.

19        MS. HAYES:  That's all I have for this witness.

20        THE COURT:  All right, you may ask.

21

22

23

24

1                    CROSS-EXAMINATION

2                    BY MR. GAB:

3        Q    Mr. Glisson, in regard to the room you're

4   doing your visitation, and all the time you've been in

5   that room for your visit, there has been no one else in

6   that room with you, correct?

7        A    Correct, just walking back and forth behind

8   the glass that looks into that room, though.

9        Q    So there's a very large metal door with a

10  small window that's probably six by four that people can

11  look into the room from, but you can't hear anything

12  that's going outside?

13       A    That's incorrect.

14       MS. HAYES:  I object.  That's a compound question.

15       THE WITNESS:  That's incorrect.  What you're

16  talking about, if you're leaving the jail, what's behind

17  me is three or four big glass windows and the warden --

18  not the warden, but there's a room that a lot of

19  lieutenants and sergeants sit in with the door open

20  while we are visiting, and then if they are bringing

21  inmates back and forth from court or just the COs need

22  to get from the elevator down to the --

23       Q    The windows you're talking about are the ones

24  that look into the administrative offices for the staff

                              30

1    of the county jail?

2         A    It also looks into the visiting room.  There's

3    three glass windows behind me they can see into.  It's

4    like living in a fish bowl.

5         Q    Did you hear anything that's being said in the

6    room when you're talking to your attorney, in the

7    outside areas, in your opinion?

8         A    It depends on how loud they are talking.

9         Q    How loud you're talking?

10        A    Or how loud they are talking.

11        Q    You would say that the relationship that you

12   have with your attorney, Patricia Hayes, has been one

13   that has been marked by a lot of violence and

14   allegations of violence by Miss Hayes against you,

15   wouldn't you?

16        A    No, I would not.

17        Q    Has Miss Hayes ever filed an OP against you?

18        A    Yes, she has.

19        Q    How many has she filed in the last two years?

20        A    I would say maybe two, maybe three.

21        Q    Okay, would it surprise you to know that she

22   filed four?

23        A    I can -- if I could see the documents, I'm not

24   going to believe you just because you tell me that.

1    Q    Let me hand you what I will mark as Group --

2    State's Group Exhibit Number 1, and it is four court

3    files, 04-OP-500, 04-OP-697, 05-OP-491 and 05-P-679.

4    Would you please review those?

5    A    Yes, I would.  Yeah, there's four of them.

6    Q    And in all of these OPs, she indicates violent

7    conduct on the part of yourself against her, doesn't

8    she?

9    A    I would imagine if it was issued, there had to

10   be some sort of violence that went on, yes.

11   THE COURT:  You need to listen to the question,

12   though.

13   THE WITNESS:  Could you repeat the question?

14   MR. GAB:

15   Q    In all of those instances Miss Hayes has

16   alleged some sort of violence actions of you against

17   her?

18   A    Yes.

19   Q    Is Miss Hayes lying in those petitions?

20   MS. HAYES:  Objection, Your Honor, that is

21   argumentative.

22   THE COURT:  Overruled.

23   THE WITNESS:  Was --

24   MS. HAYES:  And again, it's compound.  I mean,

32

1          which petition is he talking about?

2                MR. GAB:  I'll restate.

3                Q    In 04-OP-697, Miss Hayes alleges, "He became

4          physically and verbal abusive towards me.  He violated

5          my space and came within one minute of my face.   On

6          4/10/04 he took my car without my permission.   He forged

7          checks of mine all over town.   He has stolen items from

8          me and pawned them."  Are those correct statements?

9                A    I don't ever recall being physically violent

10         with Miss Hayes, but every other one that's in there is

11         absolutely true.

12               Q    So when I say that you have a relationship

13         that's stormy and abusive, you would agree with that?

14               A    Because of me, yes.

15               Q    Okay.

16               A    Because of my actions, yes, it has been

17         stormy.

18               Q    And at times, because of your actions,

19         Miss Hayes actually has been in danger of physical

20         abuse?

21               A    Not physical, verbal abuse.

22               Q    She seems to allege that you come very close

23         to physical abuse, doesn't she?

24               A    She alleges that I've come one minute is what

                                        33

1    that said, close, but I don't see her saying that I've

2    ever physically hurt her.

3          Q    If she said that, would that be untrue?

4          A    Well, there's -- I think I'm a little confused

5    by that question, because I've broken down a door which

6    that could be physically abusive.  That would scare me.

7          Q    Anything else that you've done that you would

8    typify as perhaps physically abusive?

9          A    No, except breaking a few doors down in the

10   house.

11         Q    Do you yell loudly?

12         A    Yes, I do.

13         Q    That's pretty typical of your relationship?

14         A    Um --

15         Q    On your behalf?

16         A    On my behalf.  And during this time, I do

17   believe it was shortly after that that I was in

18   in-patient treatment because I was in a manic episode

19   for a bipolar disorder.  I get pretty agitated when I'm

20   manic.

21         Q    Has Miss Hayes ever had you arrested?

22         A    No, she has not.

23         MS. HAYES:  Objection, Your Honor.  I can't have

24   someone arrested.

34

1           THE COURT:  Overruled.

2           MR. GAB:

3           Q    Has she ever called the police?

4           A    Not that I'm aware of.

5           Q    Not on you?

6           A    No, never.

7           Q    In regards to 04-OP-500, Miss Hayes alleges in

8    her petition, "He broke my door down at the house,

9    chipped my tooth and grabbed /bruised my arm.  Monday he

10    came back and stole my car, two bicycles, two cells,

11    checkbooks and has forged my name on checks and stole my

12    bank card."  This is dated 4/23/04.  Are those

13    allegations true?

14           A    Yes.

15           Q    So there is physical violence there, isn't

16    there?

17           A    Bruising her arm, I don't recall doing that,

18    but I do recall breaking down the door and all the other

19    bicycles.  I stole the checkbooks, the things that I

20    stole and took to the pawn shop, yeah, I did all of

21    those things.  I don't remember physically bruising her

22    arm.  I'd say breaking down doors is physical violence.

23           Q    Yeah, I would agree with you.

24           MS. HAYES:  Your Honor, I would object to the

35

1    relevance of this line of questioning unless he can tie

2    it into something that's more current.

3         THE COURT:  Overruled.

4         MR. GAB:

5         Q    In regards to the legal materials that's

6    Exhibit Number 1, is it right here?

7         MS. HAYES:  Yes, it is.

8         MR. GAB:

9         Q    This is what was taken away, right, no other

10   papers.  This is all of it, correct?

11        A    Yes.

12        Q    If would you show me the legal documents in

13   there, please?

14        A    Well, these are supplies.  I don't think these

15   are considered legal documents.

16        Q    So here's about 20 envelopes?

17        A    Right.

18        Q    And then here's some more large envelopes?

19        A    Yes, and these are the manila envelopes that I

20   have up in my room.

21        Q    More manila envelopes?

22        A    Right.

23        Q    And okay, so we have a bunch of envelopes?

24        A    Right.  I had the legal documents.

36

1         Q    Well, you said these are all the documents

2    that were taken away from you.  Are there other ones we

3    don't know about?

4         A    Not that I'm aware of, no.

5         Q    So this is -- this was what the jail didn't

6    want you to have?

7         A    Correct, but the materials that were handed

8    back and forth containing --

9         MR. GAB:  Judge, there's not a question to the

10   witness at this point.

11        MS. HAYES:  I believe he was asked where the legal

12   documents are, and he's trying to explain them to him.

13        THE COURT:  Overruled.

14        THE WITNESS:  What I had to pass through --

15        THE COURT:  Just a moment, there's no question.

16        MR. GAB:  Judge, this is Exhibit Number 1.  Should

17   I offer it to the Court?

18        THE COURT:  Well, I don't know if Plaintiff

19   wants --

20        MR. GAB:  Well, I would offer it to the Court.

21        MS. HAYES:  You can't.  It's my exhibit.

22        THE COURT:  Sure he can, okay.

23        MR. GAB:  I would ask that it be admitted into

24   evidence as well, Your Honor.

1          THE COURT:  It's her exhibit.  Any objection to

2     your exhibit coming in?

3          MS. HAYES:  Well, I do, because I don't think the

4     Court needs to have the actual exhibit as part of the

5     record.

6          THE COURT:  Do you object to the Court saying

7     what's in this exhibit?

8          MS. HAYES:  No, not at all.

9          MR. GAB:  That's fine.

10         THE COURT:  It's to be consistent with what Mr.

11    Glisson has indicated.  There are seven or eight

12    envelopes in here.  There are some tacks.  There are

13    some other envelopes, and there are some manila

14    envelopes.  There isn't anything with writing on it

15    other than the largest envelope that says "Scott Glisson

16    confidential legal mail", but there isn't anything in

17    that envelope.  So that's what we have.

18         MR. GAB:  That's all I have, Judge.

19         THE COURT:  All right, any questions further,

20    Counsel?

21         MS. HAYES:  Yes, Your Honor.

22

23

24

                              38

1                      REDIRECT EXAMINATION

2                        BY MS. HAYES:

3         Q     Scott, are there any -- currently any

4    outstanding Orders of Protection that prohibit you from

5    having contact with me?

6         A     No.

7         Q     You were -- you've suffered from several

8    periods of manic episodes over the past two years, is

9    that correct?

10        A     Yes.

11        Q     And during your first incarceration on August

12   16th through the 19th, were you in a manic state?

13        MR. GAB:  Objection, leading, Judge.

14        THE COURT:  I'll sustain.

15        MS. HAYES:

16        Q     In your opinion, were you suffering from any

17   symptoms of mania during your first incarceration on or

18   after August 16th, 2005?

19        MR. GAB:  Same objection, Judge.

20        THE COURT:  Sustained.

21        MS. HAYES:

22        Q     During your first incarceration, what was your

23   demeanor?

24        A     Agitated, somewhat hostile.  I would say I was

39

1    in a manic episode.  I wasn't stable, that's for sure,

2    compared to what I am now.

3        Q    At any point during your visits with me, your

4    attorney, have you ever threatened me in any way?

5        A    No, I have not.

6        Q    The envelopes that were in Exhibit 1, did you

7    ask to have them brought in to you?

8        A    Yes, I did.

9        Q    And what's the reason that you wanted

10   envelopes?

11       A    To separate the motions that we had filed and

12   to separate what my legal mail is, compared to like

13   regular mail that I might receive from my father.  That

14   way I can keep it in a confidential folder so other

15   inmates or guards, today we had a shakedown.  They can

16   go in and start reading my legal mail, and that way

17   nothing turns up missing.

18       MS. HAYES:  That's all I have, Your Honor.

19       THE COURT:  You may step down.

20       MR. GAB:  Just a little bit, Judge.

21                 RECROSS EXAMINATION

22                 BY MR. GAB:

23       Q    Now, you said during your first incarceration

24   you were in a manic phase?

```
1          A    That's correct.

2          Q    So that's a manic phase that you've been

3    describing before where all of these violent events

4    happen with Miss Hayes, is that right?

5          A    Could have been somewhat.

6          Q    And that would have been August 17th, 18th,

7    when your first incarceration was, that's the time --

8          A    You're talking about when I was in a manic

9    episode?  Yes.

10         MR. GAB:  That's all I have.

11         THE COURT:  You may step down.

12                        (Witness excused.)

13         THE COURT:  Please call your next witness.

14         MS. HAYES:  I call Kenny Marshall.

15         THE CLERK:  Raise your right hand.

16                        (Witness sworn.)

17                     KENNY MARSHALL

18   was called as a witness on behalf of the Defendant,

19   having first been duly sworn, was examined and testified

20   as follows:

21                   DIRECT EXAMINATION

22                   BY MS. HAYES:

23         Q    Kenny, can you tell the Judge your full name?

24         A    My name is Kenneth Marshall, Kenneth Earl
```

41

1    Marshall.

2         Q    And you're presently incarcerated in the

3    Sangamon County Jail?

4         A    Yes, I am.

5         Q    Do you know me?

6         A    Yes, I do.  I've known you since 1991.

7         Q    Since 1991?

8         A    Yes.

9         Q    Have I been your attorney in the past?

10        A    Yes, you have.

11        Q    How many times have I represented you on

12   different matters?

13        A    About -- I can't remember right now.  It has

14   been about two or three times or four times -- three

15   times, three or four times, something like that.  And

16   plus, you came to court for me and you tried to get me,

17   you know -- you came to court for me a couple of times.

18        Q    Okay, have I been your protective payee for

19   Social Security reasons in the past?

20        A    No, you haven't.  You done it before, yes, you

21   have.

22        Q    In the past I have been?

23        A    Yes.

24        MR. GAB:  Objection, leading, Judge.  He said no,

1    and she talked him into yes.

2         THE WITNESS:  What I was saying -- State's

3    Attorney, what I'm saying, she has been my payee a

4    couple of times, yes, she has.  I'm saying she hasn't

5    done it recently.  They took my money this time.

6         MR. GAB:  I'll withdraw the objection.

7         THE WITNESS:  They took my money for no reason.

8         MR. GAB:  I withdraw the objection.

9         MS. HAYES:

10        Q    Did you call my office in August?

11        A    Yes, I did.  I called there a couple of times,

12   and I didn't have no money.  I wanted to let you know

13   that I was locked up, that I ain't got no business for

14   being locked up for the simple fact that I want to talk

15   to you.

16        Q    Did I come visit you?

17        A    Yes, you did.

18        Q    On August 17th, the first time?

19        A    Yes, you did.

20        Q    And do you recall where we had our meeting

21   that first time?

22        A    Yes, I do.  All I know, they called it right

23   there across the hallway from my cell, H-block.

24        Q    Is it a big room?

43

```
1          A     Yes.

2          Q     Do they have desks and computers?

3          A     It ain't the library.  This is another place,

4    a big room right across the hall.  I don't know what

5    kind of room.  It wasn't no computer room, some kind of

6    room.  I can't remember.

7          Q     It wasn't separated by glass?

8          A     No, there wasn't no glass.

9          Q     Okay, and we were allowed to have a meeting in

10   that room?

11         A     Yes, we did and you had your purse, you wrote

12   down my Social Security --

13         Q     You asked me to help you with some Social

14   Security issues?

15         A     Right, yes, I did.

16         Q     Did you call my office then yesterday?

17         A     Yes, I did call your office.  I called your

18   office for the simple fact I wanted to let you know if I

19   got my time, and you want -- you can't come see me

20   Monday, and I didn't know what happened to you last

21   night.

22         Q     Did I come visit with you last night?

23         A     Yes, but on some kinds of crazy stuff.

24         Q     When you say it was on some kind of crazy
```

44

1    stuff, what do you mean?

2        A    We was talking through glass, and I told you

3    about the officers doing all of this stuff to me, and

4    the officers don't like me around.  Half of them don't

5    like me.  Three of them out of 15 don't like me.

6        Q    They made us talk through a phone through

7    glass?

8        A    Yes, they did.

9        Q    And in that room are there windows behind?

10        A    Yes, there is.

11        Q    And were there inmates and officers walking

12    by?

13        A    Yes, there was.

14        Q    All right, and did you have papers?

15        A    Yes, I did.

16        MR. GAB:  Objection, Your Honor.  This is all

17    leading questions.

18        THE COURT:  It is.

19        MS. HAYES:

20        Q    Did you have papers with you?

21        A    Yes, I had papers of what they done to me.

22        THE COURT:  That's leading.  That's what the

23    objection was.

24        THE WITNESS:  I had the papers saying what they

45