**E-FILED**
Friday, 04 November, 2005 02:03:51 PM
Clerk, U.S. District Court, ILCD

1    done to me.

2        MR. GAB:  Objection, non-responsive.

3        THE COURT:  Wait, wait, wait.  Let's start asking

4    non-leading questions.

5        MS. HAYES:  All right.

6        Q    Did you bring anything with you to our

7    meeting?

8        A    What meetin', yesterday?

9        Q    Yesterday.

10       A    I took my Bible and the three pieces of paper

11   I had to show you.

12       Q    How were you able to get your papers to me?

13       A    When I first gave them to the lady, I heard

14   her say something about why are you showing her these

15   tickets -- I mean, showing her ticket.

16       MR. GAB:  Judge, I object.

17       THE WITNESS:  They kept saying, why are you giving

18   these tickets.  They didn't want to give it to me --

19       MR. GAB:  I object to the relevance of this, Judge.

20       THE WITNESS:  When I got out of the elevator --

21       MR. GAB:  Excuse me, Mr. Marshall.  I want to raise

22   an objection.  I fail to see the relevance as to the

23   Court's order in regards to Mr. Glisson's case.

24       THE WITNESS:  I'm telling the truth.

46

1           MR. GAB:  I wasn't saying you weren't, sir.

2           THE WITNESS:  All right.

3           MS. HAYES:  So did you have -- did you give your

4      papers to anyone?

5           A    Yes, I gave them to the officer.  She looked

6      at it and kept saying, why are you giving it to her, and

7      she says in so many words I gave her papers, and I heard

8      her say well she said something about a ticket -- I

9      heard her saying something about tickets.

10          Q    Kenny, did you write down something that

11     happened to you while you were in jail?

12          A    Yes, I did.

13          Q    What was that?

14          A    I wrote one and two -- I wrote one thing on

15     there.  Somebody else wrote that they haven't got the

16     papers yet, and I wrote two things.  I wrote two things

17     on there, what happened, but the one gal wrote before

18     what happened.  I can't read or write that good.  So he

19     write it down first.  I wrote two things, and one guy

20     has wrote one thing.  His name is Michael.  I don't know

21     his last name.  I tried to find out, but I have 17

22     people that witnessed what happened to me and the

23     officer said he didn't get none of the papers.

24          Q    Kenny, the papers that you wrote, did you want

1    that to be confidential to me?

2        A    I wanted it to be confidential.  The same

3    thing I wrote to the sergeant.  He had -- he said why he

4    haven't got it yet.  Why haven't you got it yet?  I

5    wrote this on the 3rd. He didn't see me until two weeks

6    later about that.  I know what happened, the officers

7    don't like me.  So they never give it to them.  He said

8    he never got it.

9        Q    Okay, Kenny, do you have problems with reading

10   and writing?

11       A    Yes, I do.  I can't read that good.  I read at

12   about second or third grade level and write at about a

13   third grade level and do math up to 8th grade.

14       Q    You wanted me to help you with your case?

15       A    Yes, I didn't want you to help me with my

16   crime, nothing like that because I know you don't do

17   that type of work.  All I want you to help me with is my

18   Social Security, and help me with what happened to me in

19   the jail.  That's basically why I called you.  That's

20   what I wanted to talk to you about, Social Security,

21   when I first called you.

22       Q    All right, and the only way we were able to

23   talk yesterday was through the glass.

24       A    Yes, it was, that I know of.  They brought me

48

1    downstairs and told me to talk to you through this

2    glass, and I said why are we going like this.  You told

3    me to come Monday.  I told the officers that you were

4    supposed to come a couple of days before you came.  He

5    told me don't -- I told him I wasn't going to file no

6    complaint on the officer because I didn't know where I

7    was going to sign.  I can't read that good.  They had me

8    write the ticket, and the ticket through this full

9    thing.  I've got witnesses saying I didn't do it.  I've

10   got people that wrote things off this block saying he

11   didn't do nothin' because you take a shower and -- every

12   day at 8:30 I take a shower, try to, and they are going

13   to tell me some junk.  She called me a prick and calling

14   me -- but the minute I say something, where are you

15   going, calling me a prick, because I'm in the shower and

16   knowing someone else on the other side of shower, and

17   she call me a prick and call me my name.  The time I say

18   something, if I get out of the shower and this man tell

19   me to put my shirt on, but this man that got out before

20   me, he didn't say nothin' to him.  He is going to

21   tell --

22        MR. GAB:  Judge, I object to his non-responsiveness

23   at this point.

24        THE COURT:  I'll sustain.

1          THE WITNESS:  That's what happened.

2          MS. HAYES:

3          Q    Kenny, during the time that you've been

4     incarcerated, did you ever have to meet with an attorney

5     through glass or telephone?

6          A    No, my real public defender, we met in the

7     library when he first showed me about the -- what is,

8     it's a video camera, when I got caught with, and I got

9     five years, and I'm tired of get harassed.  Every time I

10    look around I'm getting harassed about stupid stuff.  I

11    took my time.  I should go to the hospital.  They keep

12    doing the same thing to me.  I'm mad right now.

13         MS. HAYES:  Okay, that's all I have, Your Honor.

14                    CROSS-EXAMINATION

15                    BY MR. GAB:

16         Q    You're currently incarcerated on a crime being

17    prosecuted by the State's Attorney's Office here in

18    Sangamon County, correct?

19         A    I don't like to say because they try to

20    prosecute me.  Yes, I do know about that.

21         Q    And I believe you're now sentenced to five

22    years in the Department of Corrections?

23         A    Sentenced to five years right now, yes.

24         Q    What was your crime?

1          A    What was my crime?

2          Q    Yeah.

3          A    I don't want to answer that.  You should know

4     my crime.  What do you mean what's my crime?

5          Q    I'll withdraw the question.  Miss Hayes didn't

6     represent you in that case, did she?

7          A    No, she didn't.

8          Q    And the jail was aware that she didn't

9     represent you in that case?

10         A    Right, on the crime.  They know she came to

11    see me and talked to me about my Social Security.

12         MR. GAB:  I don't have any other questions.

13         THE COURT:  Okay, you may step down.  Let's take a

14    break until ten to 3:00.

15                            (Witness excused.)

16                            (Recess taken.)

17                            (Witness sworn.)

18                    NANCY SUE DAVIS

19    was called as a witness on behalf of the Defendant,

20    having first been duly sworn, was examined and testified

21    as follows:

22                    DIRECT EXAMINATION

23                    BY MS. HAYES:

24         Q    Miss Davis, can you state your full name and

                            51

1    spell your last name?

2        A    Nancy Sue Davis, D-A-V-I-S.

3        Q    Are you related to Scott Glisson?

4        A    Yes.

5        Q    How are you related?

6        A    I'm his mother.

7        Q    You've been up to visit him since he has been

8    an inmate at the Sangamon County Jail?

9        A    Yes.

10       Q    How many times?

11       A    Twice.

12       Q    And during the time that you visited him, can

13   you tell the Court where you get to visit him?

14       A    We go upstairs in an elevator to the inmate

15   visitation area.

16       Q    Okay, during the time that you visit with him,

17   are you separated by glass?

18       A    Yes.

19       Q    And are there other correctional officers in

20   the room with you?

21       A    Not that I'm aware of.  I haven't seen any.

22       Q    And are there windows in the room that you

23   visit?

24       A    Yes.

52

1        Q    How many windows?

2        A    I look through one.

3        Q    The glass that you're talking about?

4        A    The glass, yes.

5        Q    On the outside of the room, are there windows

6    looking into the visiting room?

7        A    Yes.

8        Q    How many are those?

9        A    I've only seen one.

10       Q    Is it a small or big window?

11       A    I don't remember.  I was so focused on just

12    visiting Scott, I just was aware there was a window

13    behind him.

14       Q    And during the time that you visited with him,

15    have your visits been monitored by other correctional

16    officers walking by and looking into the window?

17       A    No.

18    MS. HAYES:  That's all I have.

19    MR. GAB:  No questions, Judge.

20    THE COURT:  Thank you.  You may step down.

21                    (Witness excused.)

22    THE COURT:  Do you have any objection to her

23    staying?

24    MR. GAB:  No, Judge.

1          THE COURT:  Okay, you may step down and stay in the

2     room.

3          MR. GAB:  We don't plan on calling her again,

4     correct?

5          MS. HAYES:  No.

6          THE COURT:  Any other evidence?

7          MS. HAYES:  No, Your Honor.

8                              (Witness sworn.)

9                         CANDACE CAIN

10    was called as a witness on behalf of the State, having

11    first been duly sworn, was examined and testified as

12    follows:

13                      DIRECT EXAMINATION

14                       BY MR. GAB:

15         Q    Would you state your name and occupation for

16    the record?

17         A    My name is Candace Cain.  I'm a lieutenant of

18    the Corrections Division, Sangamon County.

19         Q    And in regards to your duties at the Sangamon

20    County Jail, could you please describe them for the

21    Judge?

22         A    I'm the supervisor, second shift, and the main

23    part of my job is the safety and security of the

24    facility, of the inmates.

                              54

1          Q      Are you in charge of the activities at the

2     jail when you're on shift?

3          A      Yes.

4          Q      Would using the term "shift commander" be

5     incorrect?

6          A      No, it is correct.

7          Q      Do you make policy decisions at the time that

8     issues are brought to you on behalf of the jail?

9          A      Policy, yes.

10         Q      Were you on duty -- strike that.

11                Are you aware of a jail policy restricting the

12    attorney visitation for attorneys that have had past

13    conflicts at the jail?

14         A      Yes, sir.

15    THE COURT:   Past what?

16    MR. GAB:   That have had past conflicts at the jail.

17    THE COURT:   Past conflicts?

18    MR. GAB:   Conflicts.

19         Q      And what's the jail policy in regards to

20    restricting attorney visits?

21         A      The attorneys cannot bring -- have to follow

22    the rules and regulations of the facility.  They can't

23    bring in contraband, like pens and pencils and give it

24    to the inmates, paper clips, et cetera, cigarettes.

55

1    They have to be professional with the inmates.

2        Q    Why is that necessary for the safety of the

3    facility?

4        MS. HAYES:  Objection.  There's -- she has not

5    testified that it's necessary for the safety of the

6    facility.

7        THE COURT:  Overruled.

8        THE WITNESS:  Why is it necessary, is that the

9    question?

10       MR. GAB:

11       Q    Yes.

12       A    Because if there's a conflict, say if you have

13   a meeting with the attorney-client, and if they have a

14   problem, I have to take my officers away from their

15   post, which is the safety of the facility, and we have

16   to respond to that area.

17       Q    Are you aware of any other attorneys that are

18   restricted -- well, strike that.

19           What is the restrictions of the jail in

20   regards to attorney Patricia Hayes?

21       A    She may see her clients, but it has to be

22   between glass.

23       Q    Where does that take place?

24       A    The first floor interview room, and it --

56

1    there's a phone on each side and there's glass in

2    between.

3        Q    And during the attorney-client interview

4    through glass only, who is present in the room?

5        A    One side is the client, and --

6        MS. HAYES:  Objection, lack of foundation, unless

7    he can lay some foundation for this testimony, if she

8    has actually observed it.

9        THE COURT:  Overruled.

10       MR. GAB:

11       Q    What's your policy?

12       A    The policy is that on one side is the

13   client-inmate, and the other side is the attorney.

14       Q    How do you facilitate the passing of documents

15   between the attorney and its client?

16       A    Either one, there's someone there at all times

17   that goes by, and either -- either the person -- or the

18   client will tell us, "Hey, I've got something for them,"

19   and we just interchange it.

20       Q    Do you review those documents prior to passing

21   them between the attorney and the client?

22       A    No, no, not the legal mail.

23       Q    Do you look for contraband when you're passing

24   those documents?

1          A     Yes, we do.

2          Q     So you do look through it but you don't read

3     it.

4          A     Exactly.

5          Q     Are you aware of other attorneys in Sangamon

6     County that have the same restrictions as Miss Hayes?

7          A     Yes, sir.

8          Q     Can you name any of those attorneys?

9          A     At one time it was, and I'm not quite sure,

10    Attorney Cahnman.  We have a list of them, sir, and I

11    don't want to give you the incorrect names.

12         Q     Okay.  So you review that list at the jail to

13    make a determination?

14         A     Yes, it's posted, yes, sir.

15         Q     In regards to Miss Hayes being placed on the

16    list of restricted attorneys, who made that decision?

17         A     Assistant Superintendent Strayer and Assistant

18    Superintendent Durr.

19         Q     And did you communicate with them in regards

20    to making that decision?

21         A     Yes, sir.

22         Q     Was it upon your recommendation that that

23    decision was made?

24         A     I told them of the incident that happened and

58

1    why -- yes.

2          MR. GAB:  I don't have any other questions.

3          THE COURT:  Miss Hayes?

4                CROSS-EXAMINATION

5                BY MS. HAYES:

6          Q    Do you have any experience in constitutional

7    law?

8          A    No, ma'am.

9          Q    Has anyone ever told you that an inmate has a

10    constitutional right to consult with their attorney?

11          MR. GAB:  Objection, relevance, Judge.

12          THE COURT:  Sustained.

13          MS. HAYES:

14          Q    You're referring to an incident that you --

15    that happened that you told -- someone told Assistant

16    Warder Strayer and Superintendent Durr about?

17          A    Yes.

18          Q    Okay, did you write an incident report?

19          A    Yes, ma'am.

20          Q    And have you reviewed any documents prior to

21    testifying today?

22          A    My report?

23          Q    How -- do you have a copy of it with you?

24          A    No, ma'am, I don't.

59

1      Q    You didn't bring it to court with you?

2      A    No.

3      Q    When was the last time you reviewed it?

4      A    Last evening.

5      Q    Are you aware of any other reports that were

6   allegedly -- or that were written regarding an incident

7   that happened on August 18th, 2005?

8      A    To be honest with you, I don't know the exact

9   date, but yes, the evening that I responded to the area,

10   there were reports written, yes, ma'am.

11      Q    Who else wrote reports?

12      A    Officer Childress and Officer Doetsch.

13      Q    You don't recall the date of the incident?

14      A    August 18th, 19th, somewhere in there, ma'am.

15      Q    And that date is on your incident report?

16      A    Yes, ma'am.

17      Q    Did you consult with any other witnesses prior

18   to coming into court today regarding what happened on

19   August 18th?

20      A    I'm sorry, I'm not sure I'm following your

21   question.

22      Q    Okay.  Prior to court today, you were sitting

23   in court with Officer Childress, Officer Doetsch,

24   yourself and several other people, is that correct?

60

1      A    Yes, ma'am.

2      Q    And at that point, did you review any

3   documents?

4      A    Yes, I did.

5      Q    What documents did you review?

6      A    I believe the State's Attorney -- I believe it

7   was something that you -- I don't know who had it.  I

8   know that the State's Attorney Gab gave that --

9      Q    Did he give you a copy of a Complaint that had

10  been filed in Federal Court?

11     A    I don't know if it had been filed in Federal

12  Court.  I seen that document, yes, ma'am.

13     Q    That said complaint?

14     A    Yes.

15     Q    And you reviewed it before you testified here

16  today?

17     A    I didn't have time to read it all, but I did

18  see some things, yes.

19     Q    Did he take it back from you at some point?

20     A    Yes, ma'am.

21     Q    And while you were out in the hall, were you

22  talking to any of the other witnesses concerning what

23  happened on this incident date?

24     A    No, ma'am.

1      Q    What do you recall happening on this alleged

2    incident date?

3      A    It began -- I had met you in the first floor

4    hallway because you wanted to talk to the shift

5    supervisor about medication for your client.  You began

6    explaining about the medications, and I told you at that

7    point I didn't know anything about his medication in the

8    facility and I would have you talk to our nurse.  You

9    spoke to the nurse.  I went and I left and went to

10   another duty.  Approximately an hour, hour and a half

11   later, someone comes to me and says, "There's an

12   attorney and a client arguing up on the third floor."

13      Q    Where were you at that point?

14      A    I was in my office.

15      Q    Where was your office?

16      A    Second floor.

17      Q    Second floor?

18      A    Uh-huh.

19      Q    Okay, what happened then?

20      A    And then I responded to the area, and I had

21   two officers up there, I believe it was two officers,

22   and I asked that Mr. Glisson be taken back to his cell,

23   and I walked out with you.

24      Q    Okay, what officer allegedly witnessed an

1    argument?

2         A    This was one -- the first time when I spoke to

3    you I was told that the Officer Doetsch heard something

4    on the intercom the first time you were there, and the

5    second time I think, Officer Childress.

6         Q    The first time.  So you're getting me confused

7    here.  Are you talking about separate visits?

8         A    Same night, two visits.

9         Q    Two separate visits?

10        A    Same night, yes, ma'am, because you left to

11   get the medication and came back.

12        Q    So Officer Doetsch told you about something

13   that happened at the first visit?

14        A    Yes.

15        Q    What did he tell you happened?

16        A    He stated that the first --  at the first

17   visit that someone had rang the call box, and it was

18   answered, and someone said -- he understood it to be

19   you, that we -- it was said, "Are we done in here?"  The

20   client said, "No, we are not done in here," And there

21   was arguing, and he said he couldn't get a word in, so

22   he came out to see what the problem was.

23        Q    And what did he tell you was the problem?

24        A    That you were arguing and you were loud.

63

1          Q    Were you made aware of that at the time?

2          A    No.

3          Q    Of the incident?

4          A    Because you were leaving, and I was in the

5    middle of something else.

6          Q    So it wasn't an emergency.

7          A    He felt it was enough that he needed to get

8    down to the area, yes.

9          Q    It wasn't an emergency for you to go up to

10   check it out, is that correct?

11         A    Not for me, not at that point, no.

12         Q    All right, thank you.

13              And the second visit, what happened during

14   that visit?

15         A    I had someone come down and tell me there was

16   an argument going on between the client and an inmate

17   that had problems earlier in the evening.

18         Q    You were on third floor at that time, is that

19   correct?

20         A    No, I was on the second floor.

21         Q    So you came back up?

22         A    After someone came and got me, yes, ma'am.

23         Q    And what happened when you first arrived on

24   the third floor?

64

1          A     Inmate Glisson was being escorted back to his

2     cell.

3          Q     You didn't come into the room at that time and

4     say to this --

5          A     I opened the door, yes, ma'am.

6          Q     And you said, "This visit is ended," right?

7     Didn't you say that?

8          A     Yes, I did say that, yes, ma'am, I did.

9          Q     And the reason you gave is the two of you are

10    married, and you cannot ethically represent him.  Didn't

11    you say that?

12         A     I don't remember those words, ma'am.

13         Q     Do you recall saying that the two of you are

14    married?

15         A     I may have, yes.

16         Q     And do you recall saying that I, his wife,

17    cannot ethically represent him?

18         A     No, ma'am, I don't remember using those words.

19         Q     Well, you used words to that effect, didn't

20    you?

21         A     I can't honestly say that.

22         Q     Did you accuse me of unethical action and

23    being up there to visit Mr. Glisson?

24         A     Conduct, ma'am.

1          Q    Is that what you said?

2          A    I told you that it was unethical to be up

3     there screaming and hollering.

4          Q    No, you said because we were married?

5          THE COURT:  Wait, wait, here.  You're entitled to

6     ask a question.  This isn't going to turn into a barroom

7     fight, Miss Hayes.

8          MS. HAYES:  I understand that, Your Honor.

9          THE COURT:  You got an answer you didn't like.  You

10    can put another question to the witness, but you don't

11    get to argue with her.

12         MS. HAYES:

13         Q    Isn't it true, Lieutenant Cain, that the

14    reason you stopped this meeting is because Melissa

15    Childress told you that Mr. Glisson and I were married?

16         A    No, ma'am.

17         Q    Isn't it true that you told Mr. Glisson and I

18    that we could not meet because we were married?

19         A    I don't believe I said those words, no.

20         Q    Isn't it true, Lieutenant Cain --

21         MR. GAB:  Judge, I just would like the attorney to

22    allow her to answer the question.

23         THE COURT:  She is giving her a modest amount of

24    time to answer.

1

2          MS. HAYES:

3          Q     That when you escorted me out of the room, you

4     told me that I could not ethically represent Mr. Glisson

5     and this meeting had been cancelled because of that?

6          A     No, that's not the reason that the -- the

7     visitation was terminated, ma'am.  No, ma'am, that's not

8     correct.

9          Q     You were working last week, weren't you?

10         A     Pardon me?

11         Q     You were working that night?

12         A     Yes, ma'am.

13         Q     You were the shift duty?

14         A     Commander, yes.

15         Q     Commander.  And what is the reason that I

16    could not meet with Mr. Marshall last night in a

17    confidential client room?

18         A     Because of the prior acts.

19         Q     With Mr. Marshall?

20         A     Prior acts of your conduct.

21         Q     And what would that be?

22         A     The screaming and the yelling.

23         Q     You said there's a list of people that are not

24    allowed -- and I say attorneys are not allowed to have

67

1        normal attorney-client contact with their clients.

2             A    Yes, ma'am.

3             Q    Where is this list kept?

4             A    Main control.

5             Q    Who has a copy of it?

6             MR. GAB:  Well, I do, Judge, for one.

7             MS. HAYES:

8             Q    Have you seen a copy of it?

9             A    It's posted in main control, ma'am.

10            Q    I would ask Mr. Gab to produce a copy of this

11       memo that I have not seen a copy of.

12            THE COURT:  We are here on an emergency hearing,

13       Counsel.

14            MS. HAYES:

15            Q    That's correct, but see, these are the reasons

16       that are being raised for the first time to me today,

17       and the fact that there's a memo has never been brought

18       to my attention.  The only reason I've ever been

19       given -- the only reason --

20            THE COURT:  That's the -- you're the one that

21       wanted the hearing immediately, and I accommodated you

22       as quickly as I could and now you're telling me you want

23       to do discovery during the hearing?

24            MS. HAYES:  No, I'm just asking if Mr. Gab has a

68

1    copy of this memo, that he produce it for the Court.

2        THE COURT:  Mr. Gab?

3        MR. GAB:  Judge, this is a confidential item that's

4    kept in the jail, that names attorneys here in town.  I

5    would be happy to provide it for the Court for in-camera

6    inspection, but I don't think it's appropriate to make

7    it public in a court hearing.

8        THE COURT:  I'm concerned about making it public.

9    I might have you -- I might have you make it available,

10   subject to a protective order.

11       MR. GAB:  That would be fine as well, Judge.

12       THE COURT:  We have at least one non-sheriff

13   personnel here.  Mr. Glisson's mother, but let me see

14   who is on the list.

15           Well, I don't know that I'm going to disclose

16   this, but there are one, two, three, four, five, six,

17   seven, eight, nine lawyers on the list for various

18   reasons, and your name is included, Miss Hayes, and

19   you're on there for arguing with inmate.

20       MR. GAB:  Thank you, Your Honor.

21       MS. HAYES:

22       Q    Lieutenant Cain, have other inmates ever

23   gotten loud with their attorneys in interview rooms?

24       MR. GAB:  Objection, relevance, Judge.

69

1          THE COURT:  Overruled.

2          THE WITNESS:  Yes.  I would say yes.

3     MS. HAYES:

4          Q    And each time an inmate becomes loud, does

5     their attorney get put on the list?

6          A    I would say yes.

7          Q    Every time?

8          A    Not every time, no, ma'am, not every time.

9          Q    And is the attorney provided with some notice

10    that they are not allowed to have any client contact

11    with their clients after that?

12         A    Yes.

13         Q    And how was I provided notice?

14         A    I told you that evening, you were upset with

15    me, because I asked you to leave, and you were very

16    upset with me, and I told you if you had a problem with

17    me, you could talk to my superintendent in the morning.

18         Q    Could you explain why we have been told

19    consistently that this -- the reason we are being denied

20    access to consult with each other is because of a Court

21    order?

22         MR. GAB:  Judge, I object to the form of the

23    question.

24         THE COURT:  Sustained.  It's argumentative.

1

2          MS. HAYES:

3          Q    Have you told any of your staff that there's a

4    Court order that prohibits me from having consultation

5    was my clients?

6          A    At the very beginning of this, when you came

7    over with a Court order, I did tell my people that, I

8    did at the very beginning.

9          THE COURT:  Can we put some time frame on that?

10         THE WITNESS:  I would say approximately two weeks

11   ago approximately.

12         MS. HAYES:

13         Q    Would that have been around the time that

14   Carla Carey came back and said that Judge Eggers had

15   ordered that I have the same access to clients as any

16   other attorney?

17         A    There was something about Judge Holmes was

18   involved.  Somehow somebody said Judge Holmes.  I spoke

19   with Judge Holmes, and he stated that Judge Eggers has

20   already made the ruling, and he wasn't going to override

21   anything Judge Eggers had said.

22         Q    That was on September 8th, wasn't it?

23         A    Ma'am, I'm sorry, I don't have exact dates.

24         Q    Did you have contact with Judge Holmes?

71

1          A    I spoke with him on the phone, yes, ma'am.

2          Q    And you told him that Judge Eggers had made --

3    had issued an order saying that I was to have no

4    contact?

5          A    I believe what I told Judge Holmes is what I

6    was told, was that Judge Eggers told us to run our

7    facility the way we need to run our facility.  This is

8    how it came to me.

9          Q    And was that a written order, Lieutenant?

10         A    From whom?

11         Q    I don't know.  You said that Judge Eggers had

12   ordered that you could run your facility the way that

13   you needed to run your facility.  I was wondering if

14   that was in the form of a written order.

15         A    No, ma'am, it was not.

16         Q    And who told you that there was such an order?

17         A    I think there was two or three of us standing

18   there.  I don't know if it came from a court officer or

19   if it came from my superintendent.

20         Q    Your superintendent would have been Terry

21   Durr?

22         A    Yes, ma'am.

23         Q    Were you present when Carla Carey came back

24   from court on September 9th, the date that Judge Eggers

72

1    entered an order stating that I was supposed to have the

2    same visitation with inmates as any other attorney in

3    Sangamon County?

4         MR. GAB:  Judge, I think that Ms. Hayes is

5    misstating the evidence, and I don't believe that this

6    witness was present --

7         MS. HAYES:  I'll withdraw the question.

8         Q    Were you present when Carla Carey came back

9    from court on September 9th?

10        A    Ma'am, I don't know what court time you're

11   talking about.  I mean, I'm there all the time, when

12   Carla comes back from court, I'm there when she goes.

13        Q    At approximately 3:00, 3:30 on Friday,

14   September 9th, were you present when Carla Carey brought

15   Mr. Glisson back from court along with other inmates?

16        A    I couldn't tell you if I was or not, ma'am.

17        Q    Did you ever have any conversation with Carla

18   Carey concerning a Court order from Judge Eggers?

19        A    I don't believe it came from Carla, no, ma'am.

20        Q    Who did you have a conversation with?

21        A    My assistant superintendent and

22   superintendent.

23        Q    And do you recall the date this took place?

24        A    No, ma'am.

73

1          Q    Do you know when my name was placed on this

2     attorney list?

3          A    No, ma'am, I do not.

4          Q    Do you know who put my name on the attorney

5     list?

6          A    Per my superintendent and assistant

7     superintendent, I had it done.

8          Q    You did?              .

9          A    I had it done, yes, ma'am.

10         Q    Well, was this --  do you recall approximately

11    when you did this?

12         THE COURT:  Do you know?  Are you asking her?

13         MS. HAYES:  Yes.

14         A    Shortly after they -- the problem we had

15    upstairs, within a day or two, I would say.

16         Q    So that would have been sometime after August

17    19th?

18         A    Ma'am, I'm not going to give you a date.  I

19    don't know.

20         Q    Have you told any of your staff that there's a

21    Court order that prohibits my having contact with my

22    clients?

23         MR. GAB:  Judge, I believe these questions have

24    been asked and answered several times.

74

1          THE COURT:  Overruled.

2          MS. HAYES:

3          Q    You have not told him that?

4          A    That there's a Court order?

5          Q    Right, that you're to have -- no, your name

6    was on the list, and that's how they know your name.

7    You're to have visitation between the glass.  Have you

8    had any conversations with Sergeant Guy concerning my

9    contact with --

10         A    I don't see Sergeant Guy enough to, no, ma'am.

11         Q    Have you ever had any conversations with Tammy

12   Powell?

13         A    She is my sergeant, yes, ma'am, and my

14   sergeants are aware of the order.

15         Q    Do you have any reason -- do you know --

16         THE COURT:  What we are trying to find out, we are

17   aware of the order.  What do you think the order says?

18         THE WITNESS:  Between glass, sir,

19         THE COURT:  And you think that I entered an order

20   like that?

21         THE WITNESS:  I think what you gave us was for us

22   -- to let us run the jail the way we have previously.

23         THE COURT:  Okay.

24         THE WITNESS:  Yes, right.

75

1          THE COURT:  All right.

2          MS. HAYES:

3          Q    And you believe that that allows you just to

4     put any attorney on the this list without prior court

5     order?

6          A    Ma'am, I don't make the decisions.  In all due

7     respect, that doesn't come from me.

8          Q    But you discussed it with Superintendent Durr,

9     is that correct?

10         A    Yes, ma'am.

11         Q    And with Lieutenant Strayer -- or Assistant

12    Warden Strayer, and the three of you made the decision.

13         A    I didn't make the decision, ma'am.

14         Q    You were consulted, though, is that correct?

15         A    I told him what had happened.

16         Q    Have you personally stopped any other

17    attorney-client conferences with --  between an attorney

18    and their client?

19         A    Absolutely.

20         Q    Absolutely?  Who?

21         A    I'd rather not say.  He's on the list, sir.

22         MS. HAYES:  Your Honor, it's our position that we

23    have been singled out by Lieutenant Cain and the

24    assistant warden and assistant superintendent.

76

1          MR. GAB:  That isn't the issue.

2          MS. HAYES:  And any other -- what?

3          MR. GAB:  That isn't the issue here.  The issue is

4    whether the jail violated your order.  It's not about

5    the appropriateness of what the jail is doing.  Is that

6    correct?

7          THE COURT:  Well, I believe that's the issue.

8          MR. GAB:  Thank you.  So I would say it's

9    irrelevant.

10         THE COURT:  You can save that, I guess, for your

11   injunction action.

12         MS. HAYES:  I guess.  Thank you, I don't have

13   anything further for this witness.

14         THE COURT:  Do you have anything further?

15         MR. GAB:  No, Judge.

16         THE COURT:  You may step down, ma'am.

17                        (Witness excused.)

18         THE COURT:  Call your next witness.

19         MR. GAB:  I don't have any other witnesses, Judge.

20         THE COURT:  All right, very well.  Any rebuttal by

21   you, Miss Hayes?

22         MS. HAYES:  I recall Mr. Glisson.

23         THE COURT:  You're still under oath, Scott.

24         THE WITNESS:  Yes, Your Honor.

77

1                        (Witness recalled.)

2                        SCOTT GLISSON

3      was recalled as a witness on his own behalf, having been

4      previously duly sworn, was examined and testified as

5      follows:

6                        DIRECT EXAMINATION

7                        BY MS. HAYES:

8           Q    Scott, you heard Lieutenant Cain describe what

9      happened on August 18th.  Do you recall the two meetings

10     that she is referring to?

11          A    Yes, I do.

12          Q    And the during the second meeting, the one

13     that Sergeant Doetsch allegedly heard us arguing, what

14     happened during that meeting?

15          A    We were in discussion, and Correctional

16     Officer Melissa Childress and Lieutenant Candace Cain

17     came in, and Lieutenant Cain said, "This visit has come

18     to a halt" because we were married, and she accused you

19     of unethical action and procedures.

20          Q    Okay.

21          A    And said there was a conflict of interest

22     because you were married to me, to be my attorney.

23          Q    At any time did I raise my voice with you?

24          A    No, you did not.

                              78

1          Q    During that day -- previously during that day,

2    had you been upset with me?

3          A    I was agitated because you told me that my dad

4    was going to let me sit in here and detox and wasn't

5    going to bond me out, and I did become a little loud,

6    yes, I did.

7          Q    Other than that, was there any other large

8    commotion during our visit?

9          A    No, there was not.

10          MS. HAYES:  That's all I have.

11          THE COURT:  You may step down.

12                         (Witness excused.)

13          THE COURT:  Do you wish to ask anything further?

14          MR. GAB:  No, Judge.

15                         (Witness excused.)

16          THE COURT:  Any other evidence, Miss Hayes?

17          MS. HAYES:  No, Your Honor.

18          THE COURT:  Very well.  I'll listen to your

19    argument.

20          MS. HAYES:  Your Honor, clearly --

21          THE COURT:  We are here on the Petition --

22          MS. HAYES:  Right, for Rule to Show Cause.  I

23    believe that the Court entered an order on September 9th

24    ordering that I be allowed access to Mr. Glisson, the

1    same as any other attorney is allowed access to, and the

2    Court said at that time if the jail has a problem with

3    it, they can bring it up, but as of that time, the jail

4    had brought no -- nothing to the Court's attention.  The

5    order of the Court as of August 9th -- or September 9th

6    was that I be treated the same as any other attorney

7    visiting any other client at the Sangamon County Jail.

8    Clearly, the evidence is that they have restricted my

9    access, and prior to today, have offered absolutely no

10   reason to either myself, Mr. Glisson or the Court that

11   could be refuted, and I believe that the jail is clearly

12   in violation of this Court's September 9th, 2005, order

13   ordering me to have access to my client.  I'd ask that

14   they be found in contempt.

15        THE COURT:  Well, if allow the petition, I'll enter

16   a Rule, and they will be required to answer.  But what

17   do you have to say, Mr. Gab?

18        MR. GAB:  Judge, going back to my Motion to Strike,

19   I would similarly say that once again, if we look at the

20   redacted portions of the transcript, and I would ask the

21   Court to take judicial notice of the transcript, I

22   guess.  It is what happened, and I believe those are the

23   Court's statements in this regard, and I believe the

24   jail is correct when they interpreted your order to say

80

1    that they should treat her like an attorney of record.

2    When you break that down, all you're telling the jail is

3    she is the attorney of record.  You're not saying you

4    have to treat her in any manner.  You know, at the end

5    you say, if this becomes an issue, we will have to

6    appear on a petition to -- you don't conclude that, but

7    I assume it would be another petition.  Therefore, I

8    don't see how the jail is in any kind of contemptuous

9    position in regards to this Court's order.

10        THE COURT:  All right.  The request for a Rule to

11   Show Cause will be denied.  Not included in the

12   discussion today, as I remember the events of that week,

13   was the 9th a Friday?

14        MR. GAB:  Yes, Judge.

15        MS. HAYES:  Yes, Judge

16        THE COURT:  The 9th was a Friday.  I was aware -- I

17   think I indicated on the record for that hearing that

18   there was some issue that week that was ongoing, whether

19   Miss Hayes' license had been suspended or not, and I

20   think that I indicated I was aware that issue was

21   ongoing here, that I had called over to the ARDC that

22   morning and found out that there was an Order of

23   Suspension entered but that it was stayed.  It is my

24   recollection that somebody informed Miss Hayes that she

81

1    was to show the jail a copy of the stay of her

2    suspension.  Those were the issues, as I recollect going

3    to the hearing on the 9th that were in existence.  The

4    question was, as I recollect, whether or not Miss Hayes'

5    license -- whether in fact she was able to practice as a

6    lawyer at all going into that hearing.  At that hearing

7    I indicated that and I informed the Sheriff's Office

8    that my call to ARDC indicated that a stay was entered.

9    I informed them of that.  Then we had a question over

10   what were the conditions going to be a with visitation,

11   and I said that she was entitled to the same visitation

12   as any other lawyer would be entitled to, and -- but

13   that didn't mean that the jail wasn't able to do the job

14   that the jail has to do, and if they feel that

15   restrictions are -- appropriate restrictions are

16   appropriate, that's their call.  That wasn't mine.  So

17   that was the issue that we faced on the 9th.

18          Apparently, before that time or subsequent to

19   that time, I'm not sure when it was, you have ended up

20   on the restriction list, and you're on that list due to

21   arguing with your client.  I do recollect at the hearing

22   on the 9th, if not last week, that there were four or

23   five OP petitions that were presented to the Court that

24   I was asked to take notice of, sort of in support of the

82

1       Sheriff's position that this restriction -- or that this

2       visitation ought to be restricted, especially since

3       those petitions were filed, and we had these visitations

4       that they had permitted with argument.  So when I look

5       at this, it seems to me where we are at right now is it

6       is your yelling and screaming that has put you on this

7       list, and they need to maintain order and decorum and

8       safety and all of that other stuff over there at the

9       jail, and I just -- I can't find that they are in

10      violation of the orders that I entered on the 29th.  So

11      for those reasons, the petition will be denied -- or the

12      request for the Rule will be denied.

13              Now, we have -- you're going to have to decide

14      whether you're going to enter your appearance in that

15      case.  As to the request for the injunction, you haven't

16      entered your appearance in that matter.

17          MR. GAB:  It's under the criminal felony case, so

18      the People of the State of Illinois are present.

19          THE COURT:  Okay, you're asking me to dismiss that

20      and require Mr. Glisson to file an injunction petition

21      in State court?

22          MR. GAB:  That, I believe, is the appropriate

23      remedy.  I don't know if there's a conflict of laws

24      based upon the filing, and this is filed in Federal

83

1    District Court, and I'm not sure if you can have

2    contemporaneous complaints or not.  I'm certainly not

3    prepared to talk about conflict of law at this time.

4         THE COURT:  Well, I wouldn't expect that you would

5    be able to.  I don't have any feel about it either.

6         MR. GAB:  I don't believe it's appropriate in a

7    criminal felony proceeding to be doing this, Judge.

8         THE COURT:  So you're asking that the Court dismiss

9    that Petition for Injunction and have the -- have

10   Mr. Glisson serve all of the parties that he wishes to

11   be brought into that injunction case?

12        MR. GAB:  Well, I'm not asking for the Court to

13   make an order regarding the U.S. District Federal case.

14   No, no, I'm not talking about that.  I'm talking about

15   the injunction petition that Miss Hayes has filed,

16   attempted to file in this felony case.  I'm asking that

17   it be dismissed, Judge.

18        THE COURT:  All right, I'll dismiss it.  I don't

19   think this is the appropriate place for that injunction

20   petition to be filed.  I will continue to monitor this

21   Sixth Amendment issue with respect to Mr. Glisson being

22   in our jail.  I have an opportunity to make sure -- I

23   have an obligation, I think, to make sure that he has

24   adequate opportunity to consult with his lawyer about

84

1    his case, and I haven't heard anything that would

2    convince me otherwise at this point.

3        MR. GAB:  Thank you, Judge.

4        THE COURT:  All right.  That will be the order of

5    the Court.

6        MR. GAB:  Judge, and I apologize for doing this,

7    but there's -- I'm not clear about one issue, and it's

8    in regards to the mittimus that Mr. Glisson is currently

9    on.  That was stayed until the 20th.  He was picked up

10   on my Petition to Revoke the Mittimus and his bond on

11   the mittimus, which was an OR bond, currently there's a

12   $50,000 bond out there and there's also a mittimus.

13       THE COURT:  Have we gotten to the mittimus date?

14       MR. GAB:  We have already gotten to the mittimus

15   date.  Mr. Glisson has been in custody since the time

16   before that, and I believe you get credit for that time.

17   I don't know if -- I'm very confused whether Miss Hayes

18   represents him in that case or not.  But what I would

19   represent to the Court, I think that it is appropriate

20   that I withdraw my Petition to Revoke his Bond pending

21   his mittimus.

22       THE COURT:  He's serving the mittimus.

23       MR. GAB:  Right, because he's serving the mittimus,

24   he doesn't need to be on bond on the mittimus and be

85

1    given credit for time served since he was picked up on

2    that bond on the sentence of 180 days --

3        THE COURT:  I thought --

4        MR. GAB:  -- previously entered.

5        THE COURT:  I'm sorry to interrupt you.  I thought

6    we resolved that at the last hearing.  He was in there

7    on that, the second time on that, and that was --

8        MS. HAYES:  That was at one of our conferences,

9    yes, it was.  There is an issue regarding seven days

10   that Mr. Glisson served in Colorado when he was picked

11   up on a warrant out there and served seven days on an

12   extradition warrant.  He should be granted credit for

13   that ten days also.

14       MR. GAB:  Well, I don't know, Judge.  Mr. Harmon

15   represented him at the Petition to Revoke, and that

16   wasn't what was done at that point in time.  I don't

17   really recollect what -- was there credit for time

18   served in that mittimus?  I don't recollect.

19       MS. HAYES:  There was credit for time served in

20   that, but he was not credited for the seven days that he

21   served while he was incarcerated on a warrant in this

22   case, and that was in Colorado, from July 20th through

23   July 27th.

24       MR. GAB:  Of what year?

86

1          MS. HAYES:  This year.

2          THE COURT:  Did you waive extradition, Scott?

3          THE DEFENDANT:  I waived extradition, and they

4    released me, and I flew back home, turned myself in, and

5    that's where the three days that you gave me time served

6    for, because I was waiting on the $1,300 to bond out.

7    My father bonded me out.  That's only three days that's

8    on that piece of paper.

9          THE COURT:  But you were in custody in Colorado for

10   seven days?

11         THE DEFENDANT:  Eight days, from July 20th to July

12   28th, El Paso County, Colorado Springs, Your Honor, on

13   this warrant, on this '04 case, to revoke my probation.

14         MR. GAB:  Judge, I believe he gets credit for all

15   time incarcerated, that the maximum sentence that he can

16   be sentenced for on probation is 180 days.  I was not

17   made aware of that at the sentencing hearing.

18         THE COURT:  That would be nine days credit if you

19   were in custody from the 20th through the 28th.  That's

20   nine days, and we have the three days here.  So that's

21   12 days, so he has 12 days.

22         MR. GAB:  Yes.

23         THE DEFENDANT:  Plus being incarcerated from

24   September 3rd to the --

87

1          THE COURT:  Whenever you went in here, you're

2    serving your 180 days.  So he starts off with 12 days

3    credit, Vicki.

4          MR. GAB:  And it starts from the 3rd.

5          THE COURT:  It starts from the 3rd.

6          SERGEANT THOMPSON:  And given 12 days credit.

7          THE COURT:  Since the 3rd.

8                    (The proceedings were concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              IN THE CIRCUIT COURT FOR THE SEVENTH JUDICIAL CIRCUIT

 2                          SANGAMON COUNTY, ILLINOIS

 3

 4

 5              I, Andrea S. Pryor, an Official Court Reporter

 6      for the Circuit Court of Sangamon County, Seventh

 7      Judicial Circuit of Illinois, do hereby certify that I

 8      reported in shorthand the proceedings had on the hearing

 9      in the above-entitled cause; that I thereafter caused

10      the foregoing to be transcribed into typewriting, which

11      I hereby certify to be a true and accurate transcript of

12      the proceedings had before Robert J. Eggers, Judge of

13      said Court.

14

15                              Official Court Reporter

16

17

18

19

20

21

22

23      Dated this 1stth day

24      of November, 2005.
```

89